UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDWEST OPERATING ENGINEERS )
WELFARE FUND, *et al.,* )
)
Plaintiffs, )
) No. 22-cv-6128
v. )
) Judge April M. Perry
GROVE EXCAVATION, LLC, and GROVE )
EXCAVATING, LLC, )
)
Defendants. )
)

## OPINION AND ORDER

This is a suit for delinquent payments brought against two construction companies based

in northern Indiana. Plaintiffs are the International Union of Operating Engineers, Local 150,

AFL-CIO ("Local 150"), Midwest Operating Engineers Welfare Fund ("Welfare Fund"),

Midwest Operating Engineers Pension Trust Fund ("Pension Fund"), Operating Engineers Local

150 Apprenticeship Fund, Local 150 IUOE Vacation Savings Plan ("Vacation Plan"), Midwest

Operating Engineers Retirement Enhancement Fund ("Retirement Enhancement Fund," together

with the Welfare Fund, Pension Fund, Vacation Plan, the "Fund Plaintiffs"), and the

Construction Industry Research and Service Trust Fund ("CRF") (collectively, "Plaintiffs").

In March 2019, Defendant Grove Excavation, LLC ("Excavation") and Local 150

executed an agreement that allowed Excavation to bid on union work in the northern Indiana

region. This agreement also obligated Excavation to submit regular reports detailing the hours of

covered work performed and to make payments to Plaintiffs based on those hours. Believing

Excavation failed to make the necessary reports and contributions, Plaintiffs sued Excavation in

November 2022 under the Employment Retirement Income Security Act, 29 U.S.C. § 1001 ("ERISA") and the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA") to enforce their contractual right to audit Excavation's records and recover delinquent payments. Doc. 1.

Plaintiffs later learned that Phil Grove, Excavation's manager and part-owner, was also the owner of Grove Excavating, LLC ("Excavating"), a company engaged in construction work of the same nature and in the same region as Excavation, but on a non-union basis. Doc. 42. Accordingly, Plaintiffs amended their complaint to name Excavating as a second defendant on the belief that Plaintiffs were owed contribution payments for work done by Excavating. As litigation continued, it emerged that neither Excavation nor Excavating had kept detailed, contemporaneous payroll records of hours worked by employees. Therefore, Plaintiffs crafted an estimate of hours worked based on what documents were available, plus deposition testimony from Grove and Defendants' employees.

Plaintiffs now seek summary judgment as to Defendants' liability and the amount of damages, which includes work performed by both Defendants. The motion raises two primary issues: whether the two Defendants may be treated as a single entity and whether there is a genuine dispute for trial as to the amount of damages. Plaintiffs also seek an order for Defendants to pay Plaintiffs' audit costs and attorneys' fees.

For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

### I.  The Parties and Agreements

Local 150 constitutes an "employee organization" under ERISA and a "labor organization" under the LMRA. Doc. 98 ¶ 2. The Funds are "employee welfare benefit plans"

under ERISA, and CRF is a "labor-management cooperative committee" under the LMRA. *Id*. Excavation and Excavating are both "employers" as defined by ERISA and the LMRA. *Id*. ¶ 3.

In 2018, Phil Grove and his sister Lora Rooni formed Excavation, a company that provides excavating services in northern Indiana. *Id*. ¶¶ 7–8, 150. In March 2019, Excavation signed three memoranda of understanding ("MOU") with Local 150, each of which purported to adopt the collective bargaining agreements between Local 150 and an employer association in the region. *Id*. ¶¶ 9–10. In so doing, Excavation became eligible to bid on Local 150 work associated with those employer groups. *Id*. ¶ 9.

One MOU signed in March 2019 pertained to the Michiana Independent Building Group employer association and its corresponding collective bargaining agreement (the "Michiana CBA"). Under that MOU, Excavation bound itself to the then-operative version of the Michiana CBA and "all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein." Doc. 46-1 at 62. The MOU further provided that Excavation's adoption of the Michiana CBA would "be effective as of the date of execution" and "continue in effect from year to year thereafter and specifically adopt any successor agreement to the [Michiana CBA]." *Id*.[1]

Three versions of the Michiana CBA (collectively, the "Michiana CBAs")[2] were operative during the relevant time period. Each version required Excavation to pay dues and

---

[1] The MOU also provided a mechanism for either signatory to terminate the agreement, though that right was never exercised. Doc. 98 ¶ 12.

[2] Plaintiffs seek contributions owed to them for the period of March 2019 until June 2024, and submit three version of the Michiana CBA operative during the relevant time period. Doc. 91-2 at 39–69 (version operative June 1, 2017 through May 31, 2020); *id*. at 3–38 (version operative June 1, 2020 through May 31, 2023); Doc. 46-1 at 64–96 (version operative June 1, 2023 through May 31, 2025).

benefit contributions to Plaintiffs at set annual rates, *see* Doc. 98 ¶¶ 36, 39, and to submit monthly contribution reports as to the hours worked. *Id*. ¶ 55. The Michiana CBAs also entitled Plaintiffs to seek payroll, tax, and other records from Excavation to conduct an audit to determine whether Excavation had complied with its payment obligations. *Id*. ¶ 51.

The Michiana CBAs also incorporated the trust agreements for the Welfare Fund (Doc. 46-1 at 83), Pension Fund (Doc. 46-1 at 85), Apprenticeship Fund (Doc. 46-1 at 87), Retirement Enhancement Fund (Doc. 46-1 at 86), and Vacation Plan (Doc. 46-1 at 85).[3] In relevant part, four of these trust agreements contain the following provision:

> [W]here an Employer fails to keep records sufficient to determine the contributions due on behalf of employees and/or the benefits due employees, the Employer waives any dispute to any reasonable estimate of the amounts determined to be due by the Fund's auditors and/or Fund personnel. An estimate is "reasonable" where such estimate relies on credible employee statements or employer records, including invoices.

Doc. 98 ¶ 51, citing Doc. 91-2 at 262 (Trust Agreement for Welfare Fund); 294 (Trust Agreement for Apprenticeship Fund); 361 (Pension Fund); 395 (Retirement Enhancement Fund).

Finally, the Michiana CBAs required Excavation to pay the "cost of collection; including, but not limited to, attorney fees" related to delinquent contributions to the Fund Plaintiffs. Doc. 91-2 at 22–26, 57–60; Doc. 46-1 at 83–87. Similar language entitles the CRF and Local 150 to seek attorney fees and other costs associated with delinquent contributions and union dues payments. Doc. 91-2 at 27–28, 60–61; Doc. 46-1 at 88–89.

---

[3] The parties' joint statement of facts cite the incorporation provisions in the 2023-25 version of the Michiana CBA. Substantially similar provisions incorporating these trust agreements appear in the 2017-2020 and 2020-23 versions. *See* Doc. 91-2 at 22–26 (2020-2023 version), 57–59 (2017-2020 version).

## II.   Procedural History

In November 2022, Plaintiffs brought suit against Excavation. Doc. 1. On February 21, 2023, Plaintiffs moved for a court order directing Excavation to produce documents detailing the amount of covered work Excavation had performed. Doc. 13. The Court granted Plaintiffs' motion on February 28 and ordered Excavation to produce various categories of records. Doc. 17 at 2–3. Plaintiffs did not find Excavation's subsequent production satisfactory and moved for a hearing on a rule to show cause why Excavation should not be held in contempt for failing to comply with the Court's February 28, 2023 order. Doc. 20. While the Court did not find Excavation in contempt, it again ordered Excavation to provide Plaintiffs with the records in its possession and further ordered Phil Grove or another representative of the company to sit for a deposition. Doc. 25. At this deposition, Plaintiffs learned that Grove also controlled Grove Excavating, LLC, which Plaintiffs added as a separate Defendant. *See* Doc. 46.

As litigation continued, it came to light that Defendants did not contemporaneously track hours worked by employees, *see* Doc. 98 ¶ 84, which Plaintiffs would need to precisely calculate payments owed. In July 2024, Plaintiffs moved to compel Defendants to respond to Plaintiffs' discovery requests for documents that might shed light on the hours worked, given the lack of contemporaneous timekeeping records. Doc. 57. On August 1, 2024, the Court granted Plaintiffs' motion and ordered Defendants to respond to Plaintiffs' discovery requests by August 9. Doc. 61. On October 7, 2024, Plaintiffs returned to the Court, moving to extend the discovery deadline and for a hearing based on what Plaintiffs viewed as Defendants' ongoing failure to provide key information about work performed. Doc. 65. On October 15, the Court ruled on Plaintiffs' motion, once again ordering Defendants to comply with the Court's prior discovery order. Doc. 71.

Ultimately, Plaintiffs chose to estimate the amount of Defendants' delinquency from deposition testimony and available documents. Doc. 98 ¶¶ 138, 141. To do so, Plaintiffs estimated the monthly on-the-job hours of five individuals—Marcus Quimby, Koley Hayes, Thomas Kurtz, Andrew Kent, and Benjie Shult—who worked for Defendants during the relevant time period. *See id*. ¶¶ 87–118, 141–46. Plaintiffs then assessed how many months per year those employees worked given the seasonal nature of the work and determined start and end dates for these individuals (not all worked throughout the entire audit period) based on a mix of testimony and paychecks. *Id*. Plaintiffs then applied the Michiana CBA contribution rates to this hour total based on their determination that Defendants' projects all took place within the geographic region governed by the Michiana CBA. Doc. 98 ¶ 140. Separately, Defendants proposed their own estimate of hours worked based on Grove's memory and their evaluation of receipts, contracts, and other documents associated with the two companies, none of which explicitly recorded hours. *Id*. ¶ 129–36.

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and draw reasonable inferences in favor of the non-moving party. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018).

## ANALYSIS

### I. Liability

ERISA requires "employers to make contributions to multiemployer benefit plans in accordance with the terms" of the agreements governing those plans. *RiverStone Grp., Inc. v. Midwest Operating Eng'rs Fringe Benefit Funds*, 33 F.4th 424, 430 (7th Cir. 2022). ERISA also provides the basis for benefit plans like the Funds to sue employers to recover delinquent contributions, plus "interest, attorneys fees, and the amount equal to the greater of interest (again) or liquidated damages." *Cent. States, Se. & Sw. Areas Pension Fund v. Transp., Inc.*, 183 F.3d 623, 629 (7th Cir. 1999). The LMRA authorizes courts to consider "suits for violation of contracts between an employer and a labor organization," and specifically cases involving "violations of [a] collective bargaining agreement." *RiverStone Grp.*, 33 F.4th at 430. Because they are not benefit plans within the meaning of ERISA, Local 150 and CRF press their claims for violations of the CBAs under the LMRA, while the Fund Plaintiffs proceed under ERISA.

To be entitled to summary judgment as to Defendants' liability, Plaintiffs must show Defendants were contractually obligated to submit reports and make payments to Plaintiffs but failed to do so. Defendants start by arguing that the MOU cannot establish either Excavation or Excavating's contractual obligation to make payments to Plaintiffs because "an [MOU] signed in 2019 [could not] 'adopt' a document with an effective date in 2022 or 2023." Doc. 97 at 6.

This argument is meritless. By executing the MOU, Excavation agreed to not just to the then-operative version of the Michiana CBA but "all amendments … hereafter made," which expressly included "any successor agreement." Doc. 46-1 at 62. Defendants offer no reason against enforcement of these automatic renewal provisions, which are common in this context. *See, e.g.*, *Contempo Design, Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters*, 226 F.3d

535, 546 (7th Cir. 2000) (upholding automatic renewal provision in collective bargaining agreement); *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1156 (7th Cir. 1989) (same). The Court also rejects Defendants' related argument that Plaintiffs failed to produce the relevant CBA versions. As discussed above, Plaintiffs have supplied versions of the Michiana CBA covering the entire May 2019 to June 2024 period for which Plaintiffs seek unpaid dues and/or contributions. *See* Doc. 91-2 at 39–69, 3–38; Doc. 46-1 at 64–96. Accordingly, the Court finds there is no genuine dispute that by executing the MOU, Excavation became bound to the terms of the Michiana CBA and its successor agreements.

Excavating, however, was not a signatory to the MOU, and so Plaintiffs must find another way to establish their entitlement to seek payments from Excavating (or, alternatively, hold Excavation liable for Excavating projects). Plaintiffs advance multiple theories to bind Excavating to the Michiana CBAs, including that Grove signed one version of the Michiana CBA on behalf of Excavating,[4] that the two entities should be treated as single integrated enterprise, that specific provisions in the Michiana CBAs make Excavation liable for Excavating projects,[5] and that Excavating is Excavation's alter ego under law. For purposes of this summary

---

[4] Plaintiffs contend that on June 18, 2020, Phil Grove signed—on behalf of Excavating—the version of the Michiana CBA operative between June 1, 2020 and May 31, 2023. *See* Doc. 98 ¶ 13. Defendants dispute whether Grove signed this agreement on behalf of Excavation or Excavating, as he listed "c/o Grove Excavating, LLC" as the signatory company but listed groveexcavation@gmail.com, ostensibly an Excavation email, as the point of contact. *Id.* But in any event, even if it were undisputed that Grove signed the 2020-23 CBA on behalf of Excavating, Plaintiffs seek damages from outside that time period. Thus, this document is hardly decisive as to the full scope of Excavating's potential liability.

[5] The Michiana CBAs contain provisions stating that "terms of this Agreement shall apply to any … separate construction business entity primarily engaged in the construction industry and owned or controlled by the Employer which performs construction work of the type covered by this Agreement within the geographic jurisdiction of this Agreement." Doc. 98 ¶ 27; Doc. 91-2 at 30 (2020-2023 CBA).

judgment motion, the Court only needs to address Plaintiffs' argument that Excavation and Excavating may be treated as a single integrated enterprise.

"[W]hen two entities are sufficiently integrated, they will be treated as a single entity" for purposes of determining whether both are bound to the terms of a collective bargaining agreement executed by only one. *Lippert Tile Co. v. Int'l Union of Bricklayers and Allied Craftsmen, Dist. Council of Wisconsin and Its Local 5*, 724 F.3d 939, 946 (7th Cir. 2013). Whether two entities constitute a single enterprise is a question of law that may be resolved on summary judgment. *Cremation Soc'y of Illinois, Inc. v. Int'l Bhd. Of Teamsters Local 727*, 869 F.3d 610, 616–17 (7th Cir. 2017). Single employer status "is characterized by the absence of an arm's length relationship found among unintegrated companies," and four factors are relevant when making this determination: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Lippert Tile*, 724 F.3d at 947. "No one of these factors is conclusive; instead, the decisionmaker must weigh the totality of the circumstances." *Id*.

The Court starts with the interrelation of operations, which means the overlap of "day-to-day operational matters" between the two entities. *Id*. In this case, Defendants operated out of the same address, used the same logo, engaged in the same type of construction work, and shared equipment. Doc. 98 ¶¶ 60–63, 66, 70–71. Grove helmed day-to-day operations for both Defendants, which also used the same estimator, Kurt Evans, to bid projects. *Id.* ¶¶ 64, 66. Furthermore, Grove conceded that financial control of the two entities was "completely interrelated," with Excavation business accounts often used to pay Excavating expenses, and vice versa. *Id.* ¶¶ 72–76. These undisputed facts show substantial interrelation of operations between the two defendants.

9

Next is common management, which looks at the "actual or active control" of the at-issue entities, such as who performs "managerial functions" and whether the same individuals control "the bidding process and administrative tasks for both companies." *Lippert Tile*, 724 F.3d at 947; *see also Cremation Soc'y of Illinois*, 869 F.3d at 617 (examining whether employees at two entities "reported up the chain to the same managers and executives" or were "part of the same organizational chart"). Here, Defendants do not dispute that Grove was the only manager with whom employees for both Defendants interacted. Doc. 98 ¶ 63. Nor do they dispute that Evans submitted project bids for both companies, the only difference being that "[w]hen bidding for union projects versus non-union projects … [Evans] would change the last three letters" to reflect Excavation versus Excavating. *Id*. ¶ 65. These undisputed facts are ample evidence of common management.

Turning to centralized control of labor relations, the Court finds highly relevant that Excavation and Excavating employed the same individuals, that Grove paid employees for work on both Excavating and Excavation projects out of an Excavation bank account, and that employees were not informed of which of the two entities they were working for on any given day. *Id*. ¶¶ 63, 80. Also relevant to this analysis is whether the two entities were deliberately conceived of by their owners as "union and non-union entities." *Lippert Tile*, 724 F.3d at 947. Here, the understanding of both Grove and Evans was that that only difference between the two companies was that Excavation would perform union work and that Excavating would not. Doc. 98 ¶¶ 62, 65. On these undisputed facts, Plaintiffs have established the third factor.

Finally, the Court comes to the common ownership factor, which is the only factor Defendant challenges with citations to the record. Specifically, while Defendants do not challenge the fact of Grove's total ownership of Excavating, *see id*. ¶ 4, they contend that a

10

genuine dispute remains as to his ownership stake in Excavation. *Id.* ¶ 150. Specifically, at least on paper, Lora Rooni owns Excavation. *Id.* ¶ 7. Grove, who is Rooni's brother, claims that he does not know whether he owns 49% of Excavation, or none of it. *Id.* ¶ 150 (indicating that Grove has testified both that he assumed he owned 49% of Excavation, but also that his sister could own the entire company). Defendants concede that Rooni has never had any involvement in the day-to-day operations of Excavation. *Id.* ¶ 7. Nor did Rooni contribute any money to start Excavation. *Id.* It appears from Grove's testimony that Rooni's sole purpose at Excavation was to qualify it as a minority-owned business. Doc. 91-13 at 4, 9. Although the Seventh Circuit has not weighed in on whether a Court should give weight to an ownership interest that appears purely on paper and is otherwise a mystery to those involved, viewing the evidence in the light most favorable to Defendants, the Court will assume for the moment that there is a genuine dispute of fact as to Grove's ownership stake in Excavation.

The single enterprise analysis looks to the totality of the circumstances, with no single factor being conclusive. *Lippert Tile*, 724 F.3d at 947. With at least three of four of the factors pointing decisively to a finding that Excavation and Excavating are in fact one entity masquerading as two, the Courts finds that Excavation and Excavating should be treated as a single integrated enterprise. Specifically, the Court finds that the undisputed evidence shows a substantial degree of interrelation of operations, common management, and centralized control of labor relations between the two companies, as well as potential ownership shares by Grove in both. There is absolutely no evidence of "an arm's length relationship" such as would be "found among unintegrated companies." *Lippert Tile*, 724 F.3d at 947. Accordingly, the Court shall treat the two Defendants as a single enterprise for purposes of their obligation to make timely dues and benefit payments to Plaintiffs under the Michiana CBA. Furthermore, because the Court

11

finds they may be treated as a single enterprise, it need not address Plaintiffs' other theories for holding Excavation liable for work performed by Excavating.

As to whether Defendants failed to make payments based on covered work, Defendants concede that they performed work covered by the CBAs but failed to submit certain reports and make timely contributions to Plaintiffs. Doc. 98 ¶ 55. Accordingly, there is no genuine dispute for trial as to whether Defendants are liable for unpaid contributions. Summary judgment in favor of Plaintiffs is therefore proper on the issue of liability.

## II.    Damages

The Court turns to whether Plaintiffs are entitled to summary judgment on the amount of damages owed. ERISA requires employers to maintain records "sufficient to determine the benefits due or which may become due to … employees." 29 U.S.C. § 1059(a)(1). As such, failure to keep sufficient records can have significant consequences at summary judgment, as once a plaintiff "shows that an employer's records are deficient and produces an apparently sound accounting suggesting that money is owed, the employer [is] obliged to explain why its payments … are nonetheless proper." *Chicago Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 264 (7th Cir. 2003). If the employer fails to provide a sufficient explanation, plaintiffs "prevail on summary judgment." *Id*. That is, the Court may award summary judgment when: (1) the defendant employer failed to keep records sufficient to determine benefits due; (2) in light of those inadequacies, plaintiffs offer an "apparently sound accounting" of damages owed; and (3) the defendant employer fails to offer any evidence that puts the accuracy of plaintiff's calculation in genuine dispute. *Id*.

Additionally, in this case Defendants arguably contractually waived their right to challenge Plaintiffs' estimate of damages owed. Plaintiffs point to the following provisions of

12

four Trust Agreements incorporated into the CBAs that Defendants adopted by Excavation's
execution of the Michiana CBAs, which state:

> [W]here an Employer fails to keep records sufficient to determine the contributions due
> on behalf of employees and/or the benefits due employees, the Employer waives any
> dispute to any reasonable estimate of the amounts determined to be due by the Fund's
> auditors and/or Fund personnel. An estimate is "reasonable" where such estimate relies
> on credible employee statements or employer records, including invoices.

Doc. 98 ¶ 51, citing Doc. 91-2 at 262 (trust agreement for Welfare Fund); 294 (trust agreement
for Apprenticeship Fund); 361 (trust agreement for Pension Fund); 395 (trust agreement for
Retirement Enhancement Fund).

There is no general prohibition against contractual waivers of the right to raise certain
arguments in litigation. *See WEC 98C-3 LLC v. SFA Holdings, Inc.*, 99 F.4th 961, 970 (7th Cir.
2024) (affirmative defenses to liability may be waived in guaranty agreements); *Dye v. Wargo*,
253 F.3d 296, 302 (7th Cir. 2001) (parties may, by contract, waive "the rights to defend
themselves"); *see also Metro E. Ctr. for Conditioning & Health v. Qwest Commc'ns Int'l,* Inc.,
294 F.3d 924, 928–29 (7th Cir. 2002) (noting general rule that individuals may freely waive even
substantial entitlements). That said, the Court declines to opine on the legal effect of these
waiver provisions because Plaintiffs seek summary judgment on damages owed to all Plaintiffs
but only offer evidence of contractual waiver with respect to four: namely, the Welfare Fund,
Apprenticeship Fund, Pension Fund, and Retirement Enhancement Fund. No similar contractual
waiver has been identified regarding Defendants' right to dispute Plaintiffs' delinquency
estimates as to the Vacation Plan, CRF, or Local 150.

That said, Plaintiffs may still be entitled to summary judgment if Defendants failed to
keep records sufficient to allow a determination of contributions owed, Plaintiffs provide a sound
accounting of contributions in light of the substandard records, and Defendants offer no evidence

rebutting Plaintiffs' accounting or otherwise raising a genuine issue for trial. *Reinke*, 347 F.3d at 264. As to records, there is no dispute that Defendants' records are inadequate, as records must be "reliable," "contemporaneous," and accurately reflect the amount and type of work performed to be considered sufficient under ERISA. *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Savings Plan Trust Funds v. Royal Int'l Drywall and Decorating Inc.*, 493 F.3d 782, 786 (7th Cir. 2007). Here, Defendants concede that they never kept contemporaneous records of employee work hours during the relevant time period, and that paychecks issued to employees did not state the hours worked. *See* Doc. 98 ¶ 84. The Court therefore finds no genuine dispute as to the inadequacy of Defendants' records.

The next question is whether Plaintiffs have put forth an apparently sound accounting of what is owed. As discussed, Plaintiffs calculated their estimate by first determining that the Michiana CBAs supplied the relevant contribution rates because Defendants' projects occurred within the region covered by the Michiana CBA. Doc. 98 ¶ 140. Then, for each of Defendants' identified employees, Plaintiffs estimated the months they worked and made assumptions about the weekly and monthly hours worked based on deposition testimony. *See id*. ¶¶ 142–46.

While Defendants challenge some of the assumptions underlying Plaintiffs' calculation directly, they have also provided their own estimate of hours worked. The source of this estimate was Grove himself, who calculated hours "to the best of [his] knowledge" based on his review of prices for Defendants' project contracts, expense receipts, and bank statements, and his memory of the hours his employees worked, which Grove testified he tracked "in his head." Id. ¶¶ 94, 130. Grove's calculation of total hours based on this list worked fell below Plaintiffs' estimate, and Defendants contend this disparity forecloses summary judgment in Plaintiffs' favor, because

the Court would have to make a credibility determination to choose Plaintiffs' accounting over the one proposed by Defendants.

The Court disagrees. Inevitably, when an employer fails to keep reliable records of employee hours, there can no longer be a true and precise calculation of hours worked (and by extension, damages owed). Thus, when the inadequacy of an employer's records is not genuinely disputed, plaintiffs in delinquent contribution suits may propose and seek summary judgment on an accounting of damages that is "apparently sound" rather than one perfectly exact. *Reinke*, 347 F.3d at 264.[6] This rule prevents a windfall to employers that neglect to keep appropriate records, as it prevents an employer from "escap[ing] liability for his failure to pay … benefits due … by hiding behind his failure to keep records as statutorily required." *Laborers' Pension Fund v. A & C Env't, Inc.*, 301 F.3d 768, 783 (7th Cir. 2002), quoting *Brick Masons Pension Trust v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988).

This rule does not totally immunize a plaintiff's calculation from challenge. Plaintiffs' obligation to propose a sound accounting means a defendant employer may defeat summary judgment by presenting facts that "cast doubt upon the accuracy of [the plaintiffs'] calculations" or otherwise raise a "genuine issue of material fact … as to the amount of damages." *Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995). But of course, if the employer's evidence fails "to contradict the [plaintiffs'] assertions" of hours worked and contributions owed, there is no genuine dispute of

---

[6] This is also why plaintiffs are not entitled to rely on estimates without first establishing that an employer's records "were inadequate to allow the auditor to determine … [the amount of] covered work" for purposes of calculating damages. *Laborers' Pension Fund v. A & C Env't, Inc.*, 301 F.3d 768, 783 (7th Cir. 2002).

material fact and summary judgment is proper. *Laborers' Pension Fund v. RES Env't Servs., Inc.*, 377 F.3d 735, 739 (7th Cir. 2004).

With these principles in mind, the Court considers Defendants' challenges to and evidence contradicting Plaintiffs' accounting, starting with Grove's own estimate. The mere fact of a competing estimate does not, on its own, create a genuine issue for trial because estimates are not themselves facts. What defeats summary judgment is evidence suggesting Plaintiffs' approach was unsound; disagreement alone is insufficient. To be sure, a substantial gap between the parties' estimates might signal that one or the other may have been based on unreasonable assumptions, and so the Court assesses how Defendants made their calculation, insofar as Defendants' approach might shed light on potential flaws in Plaintiffs' own reasoning. Here, however, that methodological inquiry does not help Defendants because nothing about how Grove arrived at his estimate suggests a fatal oversight or miscalculation by Plaintiffs. Both Plaintiffs and Grove looked at the same project lists and other documents, and so it cannot be said that Plaintiffs failed to account for specific projects or documents. Nor did Grove, when pressed, articulate a methodology for deriving hours estimates from contract price or other documents. Doc. 98 ¶¶ 130, 132–33.[7] Thus, Defendants' estimate does not identify any facts undermining Plaintiffs' account.

With that, the Court turns to Defendants' other challenges to Plaintiffs' accounting, which appear mostly in Defendants' responses to certain Rule 56.1 material facts. Defendants' first contention is that its employees did not work continually throughout the relevant time period, and so Plaintiffs' accounting cannot be accurate. *Id.* ¶¶ 89–91, 96, 107, 137, 142—44,

---

[7] Plaintiffs also presented undisputed evidence that Grove overlooked certain projects and contracts when making his estimate. Doc. 98 ¶ 134.

146, 160–61. Specifically, Defendants note Grove's testimony that between 2019 and 2023, there was at least one month-long gap in work and "quite a few" weeklong gaps in work. Doc. 91-13 at 156–57. But this evidence does not contradict Plaintiffs' accounting because Plaintiffs did not assume continual work: rather, Plaintiffs' estimate imposes contribution requirements on Defendants for the months of April until December of the relevant years, a decision reflecting the seasonal nature of the companies' work. Doc. 98 ¶ 8. That said, there are a few months where Plaintiffs seem to have assessed contribution liability outside the April to December season. *See* Doc. 91-8 at 647 (damages assessed for March 2019); 648 (same for January, February, and March 2023). If there was a reason for these departures, Plaintiffs do not articulate it in their briefing.

Defendants also challenge Plaintiffs' inclusion of hours worked by Andrew Kent (or his company Kent Services) in their damage calculations, on grounds that (1) Kent was a subcontractor, not an employee, (2) Kent did not perform work within the scope of the Michiana CBA; and (3) Plaintiffs calculated an unreasonably high estimate for the number of hours Kent worked. Doc. 98 ¶¶ 116, 145. Starting with the first argument, Plaintiffs do not challenge Defendants' characterization of Kent as a subcontractor. And while the Michiana CBAs appear to include provisions against subcontracting,[8] Plaintiffs do not cite it, nor explain whether the remedy for breach of this provision is that Plaintiffs may seek contribution payments for hours worked by subcontractors. Thus, while it may be that Kent's hours were rightly included in Plaintiffs' estimate, drawing all reasonable inferences in Defendants' favor, the Court finds the appropriateness of including Kent's hours in the delinquency estimate to be in genuine dispute.

---

[8] *See*, *e.g.*, Doc. 91-2 at 14 ("The Employer agrees that he will not … sub-contract any work covered by the Scope of Work of this Agreement.")

17

Nor is this inclusion insubstantial, as Plaintiffs calculated that Defendants owe thousands of hours in contributions, to say nothing of liquidated damages and interest, based on Kent's work. *See* Doc. Doc. 98 ¶ 145.

In summary, the Court finds that Defendants' estimate of hours worked and the concerns about continual work do not raise genuine issues of disputed fact or otherwise undermine the soundness of Plaintiffs' accounting. However, the Court finds that Defendants' unaddressed, testimony-backed argument that Kent's working hours should not have been included in Plaintiffs' delinquency estimate "raise[s] a genuine issue of material fact as to the audit's accuracy." *Illinois Conference of Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1366 (7th Cir. 1995). Accordingly, the Court must deny summary judgment on the amount of damages.

### III.  Fees and Costs

Plaintiffs also ask the Court to award attorneys' fees and costs associated with auditing Defendants' records, in an amount to be determined post-judgment. The basis for Plaintiffs' request is ERISA and provisions of the Michiana CBAs. Defendants oppose the request, arguing Plaintiffs' request is premature because "a fees complaint must show some degree of success on the merits before a court may award attorney's fees." *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 255 (2010).

ERISA provides that in an action by benefit plans to recover delinquent contributions "in which a judgment in favor of the plan is awarded," the plan is entitled to not just the unpaid contributions, interest, and liquidated damages, but also "reasonable attorney's fees and costs of the action." 29 U.S.C. § 1132(g)(2)(D). And when collective bargaining agreements contain a right for parties to recover auditor and attorneys' fees, those provisions are enforceable under the

LMRA. *Int'l Union, United Auto. Aerospace & Agr. Implement Workers of Am., UAW v. Keystone Consol. Indus., Inc.*, 793 F.2d 810, 814 (7th Cir. 1986) (parties may pursue LMRA claims for "obligations greater than, and separate from, the ERISA minimum funding obligations.").

With respect to Fund Plaintiffs, Defendants do not argue that the costs of an audit would not be included in collection costs or that awarding such costs to Fund Plaintiffs would be outside the Court's discretion to award "such other legal or equitable relief as the court deems appropriate" under 28 U.S.C. § 1132(g)(2). Nor do they dispute that the Michiana CBAs obligate Defendants to pay fees and other costs associated with suits by Local 150 and CRF. Thus, given the Court's conclusion that Plaintiffs are entitled to summary judgment on the issue of liability, it finds all Plaintiffs will be entitled to costs and fees in an amount to be determined once this litigation has concluded.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part. The Court grants summary judgment on the issue of Defendants' liability to Plaintiffs under ERISA and the LMRA. Summary judgment is denied as to the amount of damages. The Court also concludes that because Defendants' liability is not in genuine dispute, Plaintiffs will be entitled to fees and costs.

Dated: November 12, 2025

_____
APRIL M. PERRY
United States District Judge